IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

BRIDGETT EDWARDS,                    )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )        Civil Action No.: 2:10cv165 MSD-FBS
                                     )
MURPHY-BROWN, L.L.C.,                )
                                     )
        Defendant.                   )

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Murphy-Brown, L.L.C., has moved pursuant to Fed. R. Civ. P. 56 for summary judgment in its favor on all claims made by plaintiff Bridgett Edwards.  Defendant's motion should be granted and judgment entered in favor of Murphy-Brown.  **This matter is set for a jury trial beginning November 15, 2011.**

## GENERAL BACKGROUND AND SUMMARY OF ARGUMENT

This is a single-plaintiff sexual harassment and retaliation case brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*  Ms. Edwards asserts that she was sexually harassed (principally by the discovery of pinholes in the door to the women's shower area).  She claims that when she reported the harassment, she was retaliated against by being transferred across the street to another Murphy-Brown pig farm, with no diminution in salary, status, or other conditions of employment.

Felicia Tennessee, a former co-worker of Ms. Edwards in the farrowing and sow insemination department of her farm, has brought a separate case based largely on the same incident.  *Tennessee v. Murphy-Brown, L.L.C.,* 2:10-cv-167 MSD-FBS (E.D. Va.).  A motion for summary judgment has been filed in that case, fully-briefed, and remains pending.  While the

1

two cases are similar, there are several points of difference. Ms. Edwards, for example, testified she had no knowledge of other alleged acts of harassment committed some years earlier by other unknown alleged harassers against other Murphy-Brown employees. Deposition of Bridgett Edwards, **Exhibit 1,** ("Edwards Dep.") at 82. Ms. Edwards testified that she believes her transfer was motivated by a years-long plot against her, which is inconsistent with her assertion that it was motivated by her protected activity of complaining, a week before the transfer. Edwards Dep. at 60-61. Ms. Edwards' asserted injuries are less – she no longer claims she is incapable of working, and testified she did not go back to work because it would have reminded her of "years" of frustration, not the door incident. Edwards Dep. at 67.

As to the substance of the two claims, Ms. Edwards' case is weaker on the evidence than Ms. Tennessee's; both claims fail for the same substantive reasons. But the main difference between the two cases is that, after leaving Murphy-Brown and filing her required administrative Charge of Discrimination under Title VII, Ms. Edwards filed for bankruptcy protection – and did not disclose her claim against Murphy-Brown. She subsequently received a full-discharge, no-asset disposition of her bankruptcy case. In these circumstances the governing law is clear: regardless of the substantive merits, if any, of her claim, Murphy-Brown is entitled to summary judgment against Ms. Edwards because she has no claim to assert. The claim was transferred, by operation of law, to the trustee in bankruptcy, and Ms. Edwards lost standing to assert it. Independently, Ms. Edwards' misrepresentation that she had no claims that could be used to compensate her creditors operates as a judicial estoppel in this case.

Assuming the Court reaches the merits of this case, Ms. Edwards' claims fail for three reasons. ***First,*** Murphy-Brown took immediate remedial action when apprised of the holes in the door. Ms. Edwards complained after the close of business on January 24, 2008, and the holes

were covered by 7:00 a.m. the next day.  The holes were filled with caulk that same day; senior

management and human resources were apprised, and an investigation was begun.  Since no one

could discover who drilled the holes, the decision was made to separate Ms. Edwards from her

current co-workers by transferring her across the street.  This would have been a completely

effective remedy – although Ms. Edwards testified she expected all the Hispanic men to be

"removed" instead – but Ms. Edwards never came back to work.  Edwards Dep. at 43.  A prompt

and effective remedial action by the company means Murphy-Brown cannot be held liable in this

case, pursuant to the doctrine established by *Faragher v. City of Boca Raton*, 524 U.S. 775

(1998) and *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998).  "A remedial action that

effectively stops the harassment will be deemed adequate as a matter of law."  *U.S. EEOC v.*

*Xerxes Corp.*, 639 F.3d 658, 670 (4th Cir. 2011).

> **Second,** the events of which Ms. Edwards complains do not meet the standards for sexual

harassment liability enunciated by in *Harris v. Forklift Sys.*, 510 U.S. 17 (1993), and its progeny.

Ms. Edwards cites to the door incident and some allegedly-obscene Spanish-language curses

among her co-workers.  Since she never reported the curses until the literal hour she left the

company, she has no claim for harassment based on those events under *Faragher.*  And even

considering the other alleged incidents, together with the holes in the door one evening, she

cannot establish "a workplace [that is] permeated with discriminatory intimidation, ridicule, and

insult that is sufficiently severe or pervasive to alter the conditions of her employment and create

an abusive working environment."  510 U.S. at 21.

> **Third,** Ms. Edwards has no retaliation claim.  It is settled law that a lateral transfer does

not meet the requirements for adverse action set out in *Burlington N. & Sante Fe Ry. Co. v.*

*White*, 548 U.S. 53 (2006).  Yet even if a transfer were actionable, discovery has established that

the allegations which allowed Ms. Edwards' claim to survive a motion to dismiss under Rule

12(b) are unsupported at the summary judgment stage. She did not fear a transfer to "notorious

Farm 6" because of uncontrolled male Hispanic harassment; after all, Farm 6 was managed by a

woman. Edwards Dep. at 54. Ms. Edwards did not want to go to Farm 6 because of a

personality conflict with a non-Hispanic female employee who worked there. (Ms. Edwards

never did tell Murphy-Brown about that, by the way.) And as Ms. Edwards forthrightly admitted

in her deposition, she has no idea why she was transferred (Edwards Dep. at 94-95), save for

speculation it was part of a years-long plot to undervalue her contribution to the company

(Edwards Dep. at 60-61) – which is, of course, not actionable even if true.

### STATEMENT OF MATERIAL FACTS
### AS TO WHICH NO GENUINE DISPUTE EXISTS

**A.** **Ms. Edwards' Employment History with Murphy-Brown**

1.     Murphy-Brown is a company engaged in the business of producing hogs for sale

to Smithfield Packing, for human consumption. Murphy-Brown owns and operates over 450 hog

farms in the United States, and has over 6,000 employees located in twelve states. Murphy-

Brown is the first livestock operation in the world to obtain the coveted ISO 14001 certification

of its Environmental Management System. Murphy-Brown owns and operates a number of hog

farms in southeastern Virginia, including the farms on which Ms. Edwards worked during her

tenure with the company.

2.     Ms. Edwards began working for Murphy-Brown in April of 1996. Am. Comp. ¶7.

3.     For many years, Ms. Edwards did not feel that she was taken seriously as a

worker at Murphy-Brown. Edwards Dep. at 57-60.

4.     Ms. Edwards felt that most of her supervisors at Murphy-Brown considered her to

be "forgetful, absent-minded, like a dizzy blond, very light-headed." Edwards Dep. 59.

Ms. Edwards felt that she was often "stretched thin" on the farm.  Ms. Edwards says that she took care of other departments, in addition to her own, but did not receive the help that she needed or the promotions to which she thought she was entitled.  Edwards Dep. 64-65.

5.      In Ms. Edwards' mind, Murphy-Brown had a longstanding plot to force her out of the company.  Edwards Dep. 57-58.  She felt that she was continually forced to prove herself and feared that if something fell through the cracks, she would be terminated.  Edwards Dep. 57-58.

6.      Ms. Edwards does not believe that this perceived plot had anything to do with her race, color, or sex.  Edwards Dep. 63.  In contrast, Ms. Edwards believed that Ms. Tennessee was treated like a "diamond in the rough" by Murphy-Brown.  Edwards Dep. 63.

**B.      Co-worker Complaints Raised Against Ms. Edwards in Early 2008**

7.      In January of 2008, Ms. Edwards worked at Farm 8 with Ms. Tennessee.  Her farm manager and immediate superior was a woman, Leigh Flournoy.  The other workers at Farm 8 at the time were Hispanic male employees:  Mr. Miguel Vasquez, Mr. Jose Rodriguez, Mr. Wizberto Izarri and Mr. Salvador Hernandez.  Deposition of Honor Leigh Flournoy, **Exhibit 2** ("Flournoy Dep.") at 16-19.

8.      In January of 2008, Ms. Edwards' male co-workers complained to farm manager Flournoy that they were doing a disproportionate amount of the work on the farm.  In particular, the male co-workers were concerned that Ms. Edwards and Ms. Tennessee were not cleaning their work areas, a fairly substantial chore.  *See* **Exhibit 3,** handwritten memorandum from farm manager Flournoy dated January 2008.  The situation did not improve, and the four male co-workers asked a Spanish-speaking human resource manager to facilitate a meeting with farm manager Flournoy to address their concerns. The male employees indicated that they did not feel they were being treated fairly by Ms. Edwards and Ms. Tennessee.  In addition, they said they

felt they were performing too many of the job responsibilities that should have been completed by Ms. Edwards and Ms. Tennessee.  Flournoy Dep. 21; Deposition of Lewis Epps, **Exhibit 4,** ("Epps Dep.") at 27; *see* **Exhibit 5,** Human Resources Department memorandum of complaints raised by Tennessee and Edwards' co-workers.  <u>This meeting took place on January 23, 2008, the day before Ms. Edwards and Ms. Tennessee "suddenly found" that "someone" had made holes in the women's locker room door.</u>  Deposition of Human Resources manager Laura Brooks, **Exhibit 6**, ("Brooks Dep.") at 25; Epps Dep. 26-27; Flournoy Dep. 20-21.

9.     After this meeting where the male employees on Farm 8 aired their grievances against Ms. Edwards and Ms. Tennessee, farm manager Ms. Flournoy spoke with Ms. Edwards and Ms. Tennessee to acquaint them with their co-workers' concerns.  Ms. Flournoy asked Ms. Edwards and Ms. Tennessee to show respect for their co-workers.  Flournoy Dep. 21-22.

### C.     <u>The Door Incident</u>

10.     As required by federal law, Murphy-Brown requires any person who enters a hog farm to take a shower and change into company-provided working clothes before entering the working side – or "clean side" – of a farm.  Flournoy Dep. 19.  Each farm has a headquarters or office building, which contains a laundry facility, men's and women's shower and locker rooms, a lounge or lunch area, and a small office area.  Each shower/locker room can be entered from outside the building; after showering, the individual changes into company-provided clothing and may exit into the "clean side" of the building, and enter the farm.  At the end of each day, most people take another shower as they leave the farm, although "showering out" generally is not required by law.  Flournoy Dep. 19.

11.     According to Ms. Edwards, she and Ms. Tennessee found three small holes in the door between the women's shower room and the short hallway inside the farm office building.

That hallway leads to the outside of the farm, to the men's locker room (in which the laundry facility for Farm 8 is located), to two small restrooms, and to the break room area of Farm 8. Ms. Edwards says that they found the holes on the evening of Thursday, January 24, 2008. Edwards Dep. 15-18; Deposition of Felicia Tennessee, **Exhibit 7,** ("Tennessee Dep.") at 53-55.

12.     At the time Ms. Edwards says she first saw the holes, all of the other employees of Farm 8 except Ms. Tennessee, Ms. Edwards and Mr. Salvador Hernandez had already left for the day.  Edwards Dep. 15; Tennessee Dep. 53.

13.     Ms. Edwards testified that she entered the women's shower/locker area, and then decided not to "shower out."  Edwards Dep. 16.

14.     Ms. Tennessee also decided not to "shower out" and, instead, decided to exit that room and just wash her hands in the break room area outside the shower area door.  Tennessee Dep. 54, 68.  When Ms. Tennessee opened the door (fully clothed), Ms. Edwards says that Mr. Hernandez was there and "was startled."  Edwards Dep. 17.  Mr. Edwards says that Mr. Hernandez "was in a position looking towards the door."  Edwards Dep. 17.   Ms. Edwards had not disrobed.

15.     Ms. Tennessee says she opened the door again and saw Mr. Hernandez enter the men's bathroom.  Tennessee Dep. 54.  She went to the break room area, washed her hands and returned to the women's shower room.  Tennessee Dep. 54, 68.

16.     Ms. Edwards says that Ms. Tennessee turned off the lights and saw three "little pinholes" in the door.  Edwards Dep. 18.

17.     Neither Ms. Edwards nor Ms. Tennessee ever actually saw Mr. Hernandez – or anyone else – look through the holes.  Tennessee Dep. 67.  Ms. Tennessee testified that Mr. Hernandez was standing beside the door, by the wall – not in front of the door – when she first

opened the door.  Tennessee Dep. at 61.  Ms. Edwards testified that she was "disappointed" in

Mr. Hernandez, since she considered him a family man.  Edwards Dep. at 21.

      **D.**    **The Report of the Door Incident and Subsequent Investigation**

18.    Ms. Edwards drove herself home that night, which usually takes 25 to 30 minutes.

Edwards Dep. 26-28.  When she arrived home, she telephoned her supervisor, Ms. Flournoy; this

call was apparently made sometime around or after 6:30 p.m. on January 24, 2008.  Edwards

Dep. 29; Tennessee Dep. 70-72; Flournoy Dep. 25; Epps Dep. 16-17.  Ms. Edwards explained to

Ms. Flournoy that she and Ms. Tennessee had discovered holes in the door.  Edwards Dep. 29;

Flournoy Dep. 25.

19.    Ms. Edwards said to Ms. Flournoy, "I think you need to go out there and take

some pictures or something of the door 'cause I'm not sure how they got there."  Ms. Flournoy

promised to do so.  Edwards Dep. 29.

20.    Ms. Flournoy told Ms. Edwards that she would call her direct supervisor,

Mr. Lewis Epps, and report the finding.  Edwards Dep. 29.  Ms. Flournoy also received a

separate telephone call from Ms. Tennessee that evening.  Flournoy Dep. 25.

21.    Ms. Flournoy immediately called Mr. Epps and explained the situation.  Mr. Epps

directed Ms. Flournoy to go to the farm in the morning, inspect the door, and report back to him.

Flournoy Dep. 25-26; Epps Dep. 16-17.

22.    Ms. Flournoy arrived at the farm the next morning, Friday, January 25, 2008,

between 6:30 a.m. and 7:00 a.m. to investigate the situation.  Flournoy Dep. 42.

23.    Ms. Flournoy observed three holes in the door.  Ms. Flournoy immediately took

photographs of the door to send to Mr. Epps via her cell phone.  Ms. Flournoy also covered the

holes completely by tacking up sheets of paper over the affected areas of the door.  Flournoy

Dep. 26, 42.

26. Once the holes were covered Ms. Edwards "showered in" in the women's shower

area as usual, as did Ms. Tennessee and Ms. Flournoy.  Edwards Dep. 37; Tennessee Dep. 73-74.

25. Throughout that same morning, January 25, 2008, Ms. Flournoy maintained

contact with her supervisor, Mr. Epps, and provided updates regarding the door situation.

Flournoy Dep. 26-27; Epps Dep. 17.  Ms. Flournoy had a prior commitment at another farm that

morning, but returned to Farm 8 later in the day and filled each of the holes with caulk, to

provide a more permanent repair.  Flournoy Dep. 26-27.

26. Ms. Edwards spoke with Ms. Flournoy about the holes.  However, Ms. Edwards

did not ask for the door to be replaced or for anyone to be fired.  In fact, Ms. Edwards did not ask

Ms. Flournoy for any specific action to be taken.  Edwards Dep. 33-34.

27. Mr. Epps also drove to Farm 8 that same day, Friday, January 25, to examine the

door.  Epps Dep. 18-19.  Ms. Flournoy met with Mr. Epps and showed him the door and the

caulked holes.  Epps Dep. 19.

28. While Ms. Edwards saw Mr. Epps meeting with Ms. Flournoy, Ms. Edwards did

not say anything to Mr. Epps.  Edwards Dep. 34.

29. Ms. Edwards was not scheduled to work over the weekend.  Edwards Dep. 46.

30. On Monday, January 28, Ms. Laura Brooks, an Employment Manager in the

Human Resource Department, received a call from Mr. Epps.  Mr. Epps explained the situation

with the door and the steps already taken to resolve the problem; however, he wanted to make

sure that the Human Resource Department was aware of the situation.  Brooks Dep. 17-18.

31. That same day, Ms. Edwards reported for work and showered in, as usual.

Edwards Dep. 46.

32.     Ms. Flournoy spoke with Mr. Epps again on Monday, January 28.  Mr. Epps directed Ms. Flournoy to place a towel over the caulked door to provide further protection. Ms. Flournoy did so.  Flournoy Dep. 29.

33.     Ms. Edwards reported for work on Tuesday, January 29.  Edwards Dep. 46.

34.     On Tuesday, January 29, Ms. Edwards called Ms. Brooks directly.  Ms. Brooks confirmed that a report had been made and asked Ms. Edwards to explain the scenario from her perspective.  Ms. Brooks agreed to further discuss the situation with Mr. Epps.  Edwards Dep. 46-47; Brooks Dep. 18-19.

35.     Ms. Edwards reported for work on Wednesday, January 30, and showered in and out, as usual.  Edwards Dep. 49.

36.     Ms. Brooks spoke further about the incident with Mr. Epps on Wednesday, January 30.  At this point, Ms. Brooks planned to interview Mr. Hernandez to obtain additional information.  Brooks Dep. 20.

37.     Ms. Edwards does not recall talking with Mr. Epps or anyone from the Human Resource Department on Wednesday, January 30.  Edwards Dep. 47-49.

38.     On Thursday, January 31, Ms. Edwards reported to Farm 8, but did not stay at the farm.  Rather, Ms. Edwards and Ms. Tennessee went to the main office to speak with the Human Resource Department.  Ms. Flournoy raised no objection to their proposal.  Edwards Dep. 49; Tennessee Dep. 83; Flournoy Dep. 32-33.  Ms. Edwards testified at deposition that she went to the office to seek out and speak with Mr. Epps.  Edwards Dep. at 49.

39.     Ms. Edwards and Ms. Tennessee arrived at the main office for Murphy-Brown operations in that section of Virginia, which is located some fifteen minutes away from Farm 8.

Ms. Edwards and Ms. Tennessee met with Laura Brooks and Lewis Epps in a conference room

for approximately an hour and a half.  Brooks Dep. 21-22; Epps Dep. 23-24; Edwards Dep. 49;

Tennessee Dep. 83-84.  *See* **Exhibit 8,** Ms. Brooks' file memorandum regarding the meeting.

40.     During the meeting, Ms. Edwards did not ask for Mr. Hernandez – or any of the

male Hispanic workers – to be fired or even disciplined.  In fact, Ms. Edwards did not ask

Human Resources or Mr. Epps to do anything at all in particular.  Edwards Dep. 50.

41.     Ms. Edwards wanted Mr. Epps to find out who put the holes in the door;

however, if he could not find out who was responsible for the holes, Ms. Edwards did not know

how the situation should been handled.  Edwards Dep. 50.

42.     According to Ms. Brooks and Mr. Epps, both Ms. Edwards and Ms. Tennessee

stated that they did not want to return to Farm 8.  Brooks Dep. 21-22; Epps Dep. 23-24.

Ms. Brooks and Mr. Epps testified that Ms. Tennessee stated that she was fine with a transfer to

another farm; however, she specifically requested not to be transferred to Farm 19 because she

did not get along with Ms. Ruby Spillman, a worker on Farm 19.  Epps Dep. 24; Brooks Dep.

39-40; Brooks Memorandum.  Ms. Edwards denies that she initiated the transfer.  Edwards Dep.

51.  This dispute is not material for purposes of this motion.

43.     The parties agree that, at this meeting, Ms. Brooks promised to contact

Ms. Edwards to explain the next steps.  Edwards Dep. 53.

44.     During this meeting, Ms. Edwards complained about certain language used by

the Hispanic workers at the farm.  This was the first time Ms. Edwards had complained about

this issue.  Edwards Dep. 42.

45.     Following the meeting on Thursday, January 31, Human Resources interviewed

three of the men who worked on the farm with Ms. Edwards and Ms. Tennessee:  Mr. Miguel

Vasquez, Mr. Salvador Hernandez, and Mr. Jose Rodriguez.  Brooks Dep. 23.  Each of these co-workers denied making the holes, denied looking through the holes, and generally denied knowledge of the incident.  However, during the interviews, the men reiterated their earlier complaints about working with Ms. Edwards and Ms. Tennessee.  For example, Mr. Vasquez complained that Ms. Tennessee yelled at him, failed to give him clear instructions, and threw a pig at him.  The men reiterated their complaints of lack of teamwork and problems with obtaining necessary supplies.  Brooks Dep. 25, 27-28.  Mr. Vasquez explicitly suggested that Ms. Edwards and Ms. Tennessee might have created the pinholes themselves in an attempt to "set up" Mr. Hernandez and get him in trouble.  Brooks Dep. 25-26.

46.      Mr. Hernandez admitted that he was walking by the women's shower room when Ms. Tennessee opened the door, but he denied that he was peeking in.  Brooks Dep. 29-30.

47.      Accordingly, the Human Resource Department was unable conclusively to determine who was responsible for making the holes, or whether anyone ever looked through the holes.  Deposition of Mary Beth Williams, **Exhibit 9** ("Williams Dep.") at 10-11.

48.      Shortly thereafter, Ms. Brooks called Ms. Edwards and told her to report to a farm across the street, Farm 6.  Edwards Dep. 53-54.  Ms. Brooks advised Ms. Edwards to call her back if she had a problem with the transfer to Farm 6.  Edwards Dep. 53.

49.      Ms. Edwards did not know if any of the workers on Farm 6 were Hispanic males because she "never even stepped on Farm 6."  Edwards Dep. 57.

50.      In her deposition, Ms. Edwards stated:  "There was a particular person there [on Farm 6] that I didn't care to really work with. . . . And – I think it was Karen."  Edwards Dep. 55.  Ms. Edwards explained:  "I'd never really had a problem with anybody or cared what they thought that left [sic], but [Karen] had a problem with me and knew I was coming over there

from that farm I thought it was going to be more of a living hell for me."  Edwards Dep. 56-57.

51.     Ms. Edwards further clarified:

> Q:     Okay.  So your problem with going to Farm 6 was that
>         Karen Thorpe was there, not that Hispanic men were there
>         who might harass you, correct?
>
> A:     Yes.

Edwards Dep. 57.

52.     Ms. Edwards never made Ms. Brooks aware of her concerns with the Farm 6

transfer.  Ms. Edwards called Ms. Brooks to discuss the situation, but the one time she called she

only left a message that did not mention her concerns.  Edwards Dep. 81.

53.     After learning of their new assignments, neither Ms. Edwards nor Ms. Tennessee

reported to work the following Monday.  Both women called in sick and stopped coming to work

altogether.  Brooks Dep. 37-38; Williams Dep. at 11.

54.     Unknown to Murphy-Brown, Ms. Edwards and Ms. Tennessee swore out a

criminal complaint against Mr. Hernandez for "peeping" in a residence.  Edwards Dep. 88-89;

**Exhibit 10,** Criminal Warrant.[1]  Shortly thereafter, the police came to Farm 8 and arrested Mr.

Hernandez, taking him away in handcuffs.  Flournoy Dep. 37-38.  Unrepresented and unable to

speak English, Mr. Hernandez pleaded guilty on February 12, 2008 to a charge in connection

with the door incident.  After learning of the guilty plea, the Human Resource Manager, Ms.

Mary Beth Williams, met with Mr. Hernandez in her office.  Williams Dep. at 10.

---

[1]      In her Amended Complaint, Ms. Edwards describes Mr. Salvador Hernandez, the man who was in the hallway when Ms. Tennessee opened the women's shower room door, as someone who "manhandled the 600 pound hogs in the breeding room which required special strength and skill" and claimed that "this is why a woman would be afraid of such a man. . ."  Am. Compl. ¶ 19.  In her deposition, Ms. Edwards admitted that Mr. Hernandez was a "little guy" and that she never viewed the Hispanic workers as a threat.  Edwards Dep. 19-20.  Ms. Tennessee agreed.  Ms. Tennessee admitted Mr. Hernandez was shorter than she was and that following the incident, she did not feel physically threatened by him.  Tennessee Dep. 65, 80.  Mr. Hernandez's Warrant of Arrest, produced during discovery, identifies Mr. Hernandez as being 5 feet, 5 inches tall and weighing only 110 pounds.  Ex. 10.

55.     Mr. Hernandez explained to Ms. Williams:  "I didn't do it, but the person that went with me to translate in the courtroom told me if I pleaded guilty then this would all be over."  Williams Dep. 10.

56.     Despite Mr. Hernandez's explanation, Ms. Williams immediately terminated Mr. Hernandez.  Williams Dep. 10.

### E.     Ms. Edwards is Unaware of any Discriminatory Motive

57.     Although Ms. Edwards filed suit alleging sexual harassment and retaliation against Murphy-Brown arising from these incidents, Ms. Edwards admitted the following at her deposition:

> Q:     Is it fair to say that you don't know what motivated
> Murphy Brown's decision to transfer you to Farm 6?
>
> * * * * *
>
> A:     I don't know.
>
> * * * * *
>
> Q:     Do you have any reason to believe that your Hispanic
> coworkers' actions towards you on the farm, any of them,
> were motivated by your sex?
>
> * * * * *
>
> A:  I don't know what they had on their mind.

Edwards Dep. 94-96 (multiple objections omitted).

### F.     Ms. Edwards' Bankruptcy Petition

58.     Ms. Edwards filed a charge with the Virginia Human Rights Council on May 15, 2008.  Charge, **Exhibit 11**.  In her charge, Ms. Edwards alleged that she had been subjected to a hostile work environment and was the victim of unlawful discrimination and retaliation by Murphy-Brown.  *Id.*   That Charge is the necessary administrative predicate for the claims asserted in this action.  The Charge was affirmed by Ms. Edwards personally, under penalty of perjury.

59.     On August 30, 2008, Ms. Edwards and her husband jointly filed a Voluntary

Petition for protection from their creditors pursuant to Chapter 7 of the United States Bankruptcy

Code in the United States Bankruptcy Court in the Eastern District of Virginia ("Bankruptcy

Court"), Petition No. 08-72916-SCS.  Voluntary Petition, **Exhibit 12**.

60.     Despite her affirmative duty to do so, Ms. Edwards failed to disclose to the

Bankruptcy Court the existence of her pending charge and potential claims against Murphy-

Brown.  *Id.*

61.     Ms. Edwards completed Schedule B in her Voluntary Petition, which required

her to identify "all personal property of the debtor of whatever kind."  Schedule B specifically

required Ms. Edwards to disclose all "[o]ther contingent and unliquidated claims of every

nature."  When completing the answers to these questions, Ms. Edwards failed to list her causes

of action against Murphy-Brown that had accrued prior to her bankruptcy filing.  *Id.*

62.     Ms. Edwards completed a Statement of Financial Affairs in connection with her

Chapter 7 filing.  *Id.*  This Statement required her to list "all suits and administrative proceedings

to which the debtor is or was a party within one year immediately preceding the filing of this

bankruptcy case."  *Id.*  While Ms. Edwards listed a garnishment proceeding that was pending in

the Franklin City General District Court, Ms. Edwards did not list her pending administrative

proceeding against Murphy-Brown.[2]  *Id.*

63.     On October 7, 2008, Ms. Edwards' bankruptcy trustee certified to the

Bankruptcy Court that he "performed the duties required of a trustee under 11 U.S.C. 704 and

has concluded that there are no assets to administer for the benefit of creditors of this estate."

---

[2]     Ms. Edwards failed to disclose a Worker's Compensation claim that she filed on April 11, 2008.  This case
was based on a claimed injury arising from the same "peeping" incident alleged in Ms. Edwards' Amended
Complaint.  Notably, Ms. Edwards had just provided sworn deposition testimony in that case on July 9, 2008 – the
month before she filed her bankruptcy petition.

*See* Trustee's Report of No Distribution, Docket Report #9, **Exhibit 13**.

64.     Subsequently, on December 15, 2008, the Bankruptcy Court discharged Ms. Edwards and her husband from their indebtedness.  Discharge Order, **Exhibit 14**.

65.     Ms. Edwards declared that her submissions to the Bankruptcy Court were declared true and accurate under penalty of perjury.  *See* Voluntary Petition, Ex. 12.

66.     Ms. Edwards was represented by counsel during her bankruptcy proceeding.  *See* Voluntary Petition, Ex. 12.

## LAW AND ANALYSIS

### Standard of Review Under Rule 56 of the Federal Rules of Civil Procedure

Summary judgment is appropriate where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The mere existence of some alleged factual dispute will not defeat a motion for summary judgment, and factual disputes that are irrelevant or unnecessary are to be ignored.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To defeat this motion, a genuine dispute as to a material fact, the materiality of which will be determined by substantive law, must exist; the trial judge must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*. at 251-52.

I.     **MS. EDWARDS' CLAIMS AGAINST MURPHY-BROWN WERE TRANSFERRED TO THE TRUSTEE IN BANKRUPTCY, AND SHE LACKS STANDING OR ANY INTEREST IN THE CLAIMS**

A.     **Ms. Edwards Can Not Pursue Undisclosed Pre-Petition Claims**

The fundamental principles of the Bankruptcy Code are to allow debtors a fresh start, while making an equitable distribution of the debtors' assets – liquidated and unliquidated – for the benefit of their creditors.  To effect these goals, debtors filing for bankruptcy are required to disclose any contingent or unliquidated claims to their creditors and to the Trustee, so the Trustee

may make an informed decision whether to pursue those claims for the benefit of the creditors. When a contingent or unliquidated claim is not disclosed – which happened here – the creditors are, in effect, defrauded. They are denied any possibility of a distribution of their share of the value of that asset, and denied even an opportunity to evaluate the worth of that asset.

Upon Ms. Edwards' filing for bankruptcy protection under Chapter 7, <u>all</u> of the legal and equitable interests Ms. Edwards had – including contingent and unliquidated interests -- became the property of the bankruptcy estate. In bankruptcy, the "bankruptcy estate" is a legal entity separate from the debtor herself. [3] All causes of action owned by the debtor are automatically included in the bankruptcy estate. "Specifically included [in the bankruptcy estate] are causes of action which the debtor could assert at the commencement of the case." *Goodman*, 809 F.2d at 232. *See In re Winebrenner*, 170 B.R. 878, 882 (Bankr. E.D. Va. 1994). "**<u>Generally speaking, a pre-petition cause of action is the property of the Chapter 7 bankruptcy estate, and only the trustee in bankruptcy has standing to pursue it</u>**." *Parker v. Wendy's Int'l, Inc*., 365 F.3d 1268, 1272 (11th Cir. 2004) (emphasis added). *Accord, Richman v. First Woman's Bank (In re Richman)*, 104 F.3d 654, 657 (4th Cir 1997).

Ms. Edwards' cause of action against Murphy-Brown accrued in January of 2008, seven months before she filed her August 30, 2008 Chapter 7 bankruptcy petition. Ms. Edwards was certainly aware that the action had accrued because she filed an administrative charge against Murphy-Brown on May 15, 2008. The claims currently before this Court constituted "contingent and unliquidated claims" of Ms. Edwards at the time she filed for bankruptcy protection. Likewise, Ms. Edwards' pending administrative charge against Murphy-Brown constituted a

---

[3] *See Detrick v. Panalpina, Inc*., 108 F.3d 529, 535 (4th Cir. 1997) (estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case"); *see also Goodman v. Phillip R. Curtis Enters*., 809 F.2d 228, 232 (4th Cir. 1987) (debtor's interest in property becomes property of the estate).

"suit[] and administrative proceeding[] to which the debtor is or was a party within one year immediately preceding the filing of [her] bankruptcy case."  As such, these causes of action became the property of Ms. Edwards' Chapter 7 bankruptcy estate on the date she instituted her bankruptcy proceedings.  Ms. Edwards' claims remain part of the debtors' bankruptcy estate. She has no standing to pursue them.  *See Parker*, 365 F.3d at 1272.  Because only the trustee has standing to pursue any contingent or unliquidated claims Ms. Edwards had when she filed her Chapter 7 bankruptcy, Murphy-Brown is entitled to summary judgment.

On occasion, a trustee may choose to abandon a potential claim, which allows the debtor to pursue it.  *See Detrick*, 108 F.3d at 535 (recognizing that the decision to pursue a claim or not is vested within the trustee's discretion).  That did not happen here.  In order to effectively abandon a claim, and thus vest standing with the debtor, a judicial determination must occur, which was not the case here.  *See Steyr-Daimler-Puch of Am. Corp., v. Pappas*, 852 F.2d 132, 136 (4th Cir. 1988).  And where a debtor has <u>not</u> listed or scheduled the potential claim, the Trustee has no knowledge of the claims and, as a result, cannot abandon these claims.  In such situations, the undisclosed claims remain a part of the bankruptcy estate, unable to be asserted by the debtor.  *See In re Winebrenner*, 170 B.R. at 882.

**B.     Ms. Edwards' Intentional Failure to Disclose Her Claims**
**Operates as a Judicial Estoppel, Warranting Summary Judgment**

The doctrine of judicial estoppel precludes Ms. Edwards from pursuing her claims against Murphy-Brown.  In applying judicial estoppel, three elements must be satisfied.  *See Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996).  First, the party against whom estoppel is being sought must have taken an inconsistent position of fact in prior litigation.  *Id.*; *see also New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Second, the former position must have been accepted by the court.  *Lowery*, 92 F.3d at 224.  Finally, the party must have intentionally misled

the court in the prior litigation to gain an unfair advantage. *Id.* "The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *Id.* at 223 (citations omitted). In applying this doctrine, the judicial process is protected by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 750; *see also Van Gaalen v. Sparks*, 555 F. Supp. 325, 330 (E.D. Va. 1983). Here, all three elements have been met.

      1.   <u>Ms. Edwards Has Taken Inconsistent Positions of Fact.</u>

Ms. Edwards represented to the Bankruptcy Court that she had no potential assets in the form of a pending administrative proceeding or accrued contingent causes of action against Murphy-Brown. She now represents to this Court that she does. Ms. Edwards filed her Statement of Financial Affairs and the Schedules under oath stating that she did not have such potential assets. *See* 18 U.S.C. § 152 (criminalizing act of making false oath to bankruptcy court or concealing assets from same).

The importance of the accuracy of these disclosures cannot be overemphasized. *See RTC Mortgage Trust 1995-S/N2 v. McMahon*, 225 B.R. 604, 608-09 (E.D. Va. 1997), *aff'd*, 155 F.3d 560 (4th Cir. 1998). In *McMahon*, the court held that a debtor who listed a particular loan on his Bankruptcy Schedules could not claim in subsequent litigation that the loan was invalid. 225 B.R. at 608-09. There, the court specifically found that the debtor-plaintiff was judicially estopped from asserting a position contrary to the position the debtor maintained in the Schedules filed with and accepted by the bankruptcy court. *Id.* at 609. Attempting to maintain, in this case, a position diametrically opposed to her sworn representations to the Bankruptcy Court is exactly the type of conduct judicial estoppel is meant to address. "[S]worn statements in bankruptcy schedules 'must be regarded as serious business' because 'the system will collapse if

debtors are not forthcoming.'" *In re Hatton*, 204 B.R. 477, 483 (E.D. Va. 1997).

    2.    <u>The Bankruptcy Court Accepted Ms. Edwards' Misrepresentations.</u>

The Bankruptcy Court accepted Ms. Edwards' position that she had no causes of action, contingent or unliquidated claims, and no administrative proceedings to disclose. Based on this incorrect information, the Bankruptcy Court granted Ms. Edwards a <u>no asset discharge</u> under her Chapter 7 bankruptcy. *See* Ex. 14.

    3.    <u>Ms. Edwards Intentionally Misled the Bankruptcy Court</u>

In bankruptcy cases, courts and trustees rely heavily on the debtor's Statement of Financial Affairs and Schedules in determining whether a discharge is warranted and in determining what degree of relief a debtor is afforded. *See Burnes v. Billups*, 291 F.3d 1282, 1286 (11th Cir. 2002); *see also Peoples Bank of Charles Town v. Colburn (In re Colburn)*, 145 B.R. 851, 853 (Bankr. E.D. Va. 1992). For this reason, a debtor signs bankruptcy schedules and the Statement of Financial Affairs under penalty of perjury as these "written declarations have the force and effect of oaths." *In re Colburn*, 145 B.R. at 857 (citations omitted); *see also* 18 U.S.C. § 152. "Courts in numerous cases have precluded debtors or former debtors from pursuing claims about which the debtors had knowledge, but did not disclose, during the debtors' bankruptcy proceedings." *In re Coastal Plains*, 179 F.3d at 208 (citing *Payless Wholesale Dist., Inc., v. Alberto Culver (P.R.), Inc.*, 989 F.2d 570 (1st Cir. 1993); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988)). In *In re Coastal Plains*, the Fifth Circuit held that a debtor was judicially estopped from pursuing a claim not disclosed to the bankruptcy court because the debtor was aware of its cause of action and had motive to conceal it from the bankruptcy court. 179 F.3d at 202.

In bankruptcy cases, a "debtor's failure to satisfy [her] statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims

or has no motive for their concealment." *Id*. at 210 (footnote omitted).  In explaining the seriousness of failing to disclose information required by law, one district court stated:

> Society's core message, as expressed in over 100 false statement statutes, in its bankruptcy concealment and tax fraud laws, and in its statutory prohibition against deceiving government agencies, is clear: those who actively or passively (by failing to disclose material facts) deceive the government - especially the judicial branch, which so heavily depends upon truthful disclosures under oath - should, at a minimum, reap no advantage from doing so. That message would be disserved by giving [the plaintiff] a free pass here.

*Scoggins v. Arrow Trucking* Co., 92 F. Supp. 2d 1372, 1376 (S.D. Ga. 2000) (footnotes omitted).

A "rebuttable inference of bad faith arises when averments in the pleadings demonstrate both knowledge of a claim and a motive to conceal that claim in the face of an affirmative duty to disclose." *Krystal Cadillac-Oldsmobile GMC Truck, Inc*, *v. General Motors Corp*., 337 F.3d 314, 321 (3d Cir. 2003) (citing *Oneida Motor Freight*, 848 F.2d at 416-418).  In *Krystal Cadillac-Oldsmobile GMC Truck, Inc*., the Third Circuit found that a Chapter 11 debtor was judicially estopped from asserting its claims against GM for terminating its franchise agreements because it failed to disclose this potential cause of action to the bankruptcy court.  337 F.3d at 323.  The court stated that: "[a]lthough we do not require debtors to list hypothetical claims that are so tenuous as to be fanciful, we do require them to advise creditors of the kind of potential claims that Krystal is asserting here." *Id*.  Nothing "fanciful" exists about Ms. Edwards' lawsuit.

She was a party to a formal administrative proceeding alleging unlawful discrimination and was soon to be a plaintiff in a federal lawsuit when her bankruptcy proceeding was instituted.  Ms. Edwards' bad faith is further demonstrated by the fact that she listed debts she owed to creditors, as well as a lawsuit where she was the defendant in a garnishment case – so she certainly knew that lawsuits should be listed as a potential asset or liability, but she nevertheless concealed her claims against Murphy-Brown.  This permitted her to have her debts

discharged or significantly reduced while simultaneously preserving her right to recover against Murphy-Brown.  In *Payless*, the First Circuit found that such conduct amounts to a "palpable fraud that the court will not tolerate, even passively."  *Payless Wholesale Dist., Inc.*, 989 F.2d at 571.  "Needless to say, judicial estoppel is intended to prevent just such a process."  *In re Coastal Plains*, 179 F.3d at 213.

## II.     MURPHY-BROWN'S PROMPT AND EFFECTIVE REMEDIAL ACTION BARS MS. EDWARDS' CLAIMS

Immediately upon learning of Ms. Edwards' allegations of harassment, Murphy-Brown acted promptly and effectively to remedy each situation, thus shielding it from any and all liability under Title VII.  *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998).  Title VII is not a strict liability statute, and a plaintiff must present "sufficient evidence of a fourth element: that there is some basis for imposing liability" for the harassment on the employer. S*priggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).  *See also EEOC v. Xerxes Corp.*, 639 F.3d 658, 668-69 (4th Cir. 2011).

If an employer takes prompt and effective remedial measures after learning of an alleged incident, courts will not impose liability.  "A remedial action that effectively stops the harassment will be deemed adequate as a matter of law." *Xerxes,* 639 F.3d at 669 (citing *Knabe v. Boury Corp.*, 114 F.3d 407, 411-12 n.8 (3d Cir. 1997).  There is no exhaustive list or particular combination of remedial measures that an employer should employ. *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 178 (4th Cir. 2009); *Xerxes*, 639 F.3d at 669.  The Fourth Circuit has considered, among other things, the promptness of the employer's investigation following a complaint, whether the employer interviewed or disciplined the offending employees for their actions, and whether the employer's response was actually effective.  *Id*.  All of these factors are present here.  In addition, the Fourth Circuit explained:

> By way of example, responses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, **scheduling changes and transfers**, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination.

*Id.* at 670 (emphasis added).

In *Alford v. Martin & Gass, Inc.*, this Court analyzed a racial harassment claim that involved a noose hung from a piece of equipment. The employer was not liable for workplace harassment because it immediately investigated the incident, spoke to employees, removed the offending display, and met with the victim on multiple occasions to inform him of the actions taken. *Alford v. Martin & Gass, Inc.*, No. 1:08cv595, 2009 U.S. Dist. LEXIS 15110 (E.D. Va. Feb. 25, 2009). Likewise, in *Xerxes,* the Fourth Circuit found that an employer's response to racially-charged messages left in a locker was sufficient to avoid liability. The employer investigated the incidents, interviewed employees, and spoke with the victims. 639 F.3d at 673.

An employer is not required to terminate a particular "perpetrator" – even one identified with certainty, as was not the case here – unless termination is the only reasonable response that the employer could take to end the harassment. *Id.* at 670. Title VII only requires that the employer take "steps reasonably likely to stop the harassment." *Id.* at 674 (quoting *Knabe v. Boury Corp.*, 114 F.3d 407, 414 (3d Cir. 1997)). This standard "in no way requires an employer to dispense with fair procedures for those accused or to discharge every alleged harasser." *Xerxes,* 639 F.3d at 674-75 (quoting *Harris v. L&L Wings, Inc.*, 132 F.3d 978, 984 (4th Cir. 1997)). Instead, the court must balance "the victim's right, the employer's rights, and the alleged harasser's rights," for if employers were forced to discipline employees following all alleged harassment, employers would inevitably face claims from the other direction for violations of

due process and wrongful termination.  *Id.* at 675 (quoting *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 677 (10th Cir. 1998)).

Ms. Edwards notified her supervisor, Ms. Flournoy, about the pinhole discovery after work hours on Thursday, January 24, 2008.  Edwards Dep. 29; Tennessee Dep. 70-72; Flournoy Dep. 25.  Despite the late hour, Ms. Flournoy chose not to wait until the morning and immediately contacted her supervisor, Mr. Epps, to report the incident and devise a response plan.  Flournoy Dep. 25-26; Epps Dep. 16-17.  By 6:30 a.m. or 7:00 a.m. the next morning – approximately 12 hours after learning of the pinholes, a period during which no one was at work – Ms. Flournoy arrived at Farm 8 to investigate.  Ms. Flournoy took photographs and ensured that the holes were covered.  Flournoy Dep. 26, 42.  Ms. Flournoy subsequently caulked the holes to provide a more permanent solution.  Flournoy Dep. 26-27.  Mr. Epps, the second level supervisor, also drove to Farm 8 that next day to investigate.  Epps Dep. 18-19.  Mr. Epps reported the issue to the Human Resource Department, Brooks Dep. 17-18, which promptly interviewed the farm workers, spoke with Ms. Edwards and Ms. Tennessee on multiple occasions, and, based on Ms. Edwards' uneasiness, allowed Ms. Edwards to transfer to Farm 6, directly across the street.  Brooks Dep. 21-30; Epps Dep. 23-24; Edwards Dep. 46-47, 49, 53; Tennessee Dep. 102-03.  Ms. Edwards did not experience any subsequent harassment in the five days she chose to come to work following the door incident, and "showered in" and "showered out" in a normal way – as did her female manager and Ms. Tennessee, using the same shower. Nevertheless, Ms. Edwards simply stopped coming to work within one week of discovering the pinholes.

Upon learning that Mr. Hernandez pleaded guilty to a peeping-related misdemeanor – he was fined $100 – and although his understanding of the guilty plea remains questionable, Murphy-Brown promptly terminated Mr. Hernandez. Williams Dep. 10.

Murphy-Brown's prompt and effective remedial measures mean that the company is entitled to the protection afforded by the affirmative defense articulated in *Faragher* and *Ellerth*. Murphy-Brown is entitled to summary judgment in its favor.[4]

### III. THE EVENTS EXPERIENCED BY MS. EDWARDS DO NOT CONSTITUTE ACTIONABLE SEXUAL HARASSMENT

To establish a hostile work environment claim under Title VII, a plaintiff must prove *inter alia* that the harassment was sufficiently severe or pervasive. *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (citing *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-184 (4th Cir. 2001)). The plaintiff must show that her "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Harris v. Forklift Sys*., 510 U.S. 17, 21 (1993) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65-67 (1986)). The plaintiff must show that the work environment was both subjectively and objectively hostile. *EEOC v. Sunbelt Rentals, Inc*., 521 F.3d 306 (4th Cir. 2008). A court must examine the totality of the circumstances, including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. at 315 (citing *Harris*, 510 U.S. at 21). *See generally Faragher v. City of Boca Raton*, 524 U.S. 775,

---

[4]     Murphy Brown has a well-articulated and long-standing policy against sexual harassment and against retaliation. **Exhibit 15** (Harassment Policy); **Exhibit 16** (handbook excerpt); **Exhibit 17** (Ms. Edwards' acknowledgement of the policy). Ms. Edwards utterly prevented Murphy-Brown from investigating any suggestion that her transfer from Farm 8 was retaliatory, since she never – ever – complained to Murphy Brown about that transfer. She just stopped working.

778 (1998) ("ordinary tribulations of the workplace, such as the sporadic use of abusive language, [offensive] jokes, and occasional teasing" are not actionable; Title VII is not a "general civility code"); *Jordan v. Alternative Resources Corp.*, 458 F.3d 332 (4th Cir. 2006) (no reasonable person could believe that single use of epithet "nigger" as part of discussion referring to "black apes" constituted actionable harassment).

This is a standard the evidence in this case does not meet.  While the presence of the pinholes in the shower-area door is disturbing, Ms. Edwards was fully-clothed at the time they were discovered, it happened only once, and there was no proof that any peeping actually occurred.  Ms. Tennessee admits that she never actually saw Mr. Hernandez – or anyone – look through the pinholes.  Tennessee Dep. 67.   Over the next week, Ms. Edwards continued to report to work and "shower in" each morning.  And the incident was unique – while the "very nature" of a hostile work environment "involves repeated conduct," not present here.  *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 (2002).  *See Byers v. HSBC Finance Corp.,* 416 F. Supp. 2d 424, 435 (E.D. Va. 2006) (Smith, J.) ("[a]lthough the alleged acts of sexual harassment occurred over approximately six weeks, an act did not occur daily, nor did the same act occur repeatedly") (granting summary judgment for employer on basis, *inter alia*, that conduct was not sufficiently severe or pervasive to be actionable).

## IV.   THE LATERAL TRANSFER WAS NOT "ADVERSE"

Ms. Edwards' evidence conclusively demonstrates that her transfer to Farm 6 was not materially adverse.  Ms. Edwards does not claim that her compensation, responsibilities, title, or other terms and conditions of employment would have been affected by the transfer.  They were not.  Her lateral transfer simply does not rise to the level of a materially adverse action required for a retaliation claim under Title VII.

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must establish "that [she] engaged in a protected activity, that the employer took an adverse action against [her], and that a causal relationship existed between [her] protected activity and the employer's adverse action." *Baqir v. Principi*, 434 F.3d 733, 747 (4th Cir. 2006).  An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment and focuses on "whether there has been discrimination in such ultimate decisions as hiring, granting leave, discharging, promoting, and compensation." *Boone v. Goldin*, 178 F.3d 253, 255-56 (4th Cir. 1999); *Bullard v. Panasonic Corp. of N. Am.*, 418 F. Supp. 2d 802 (E.D. Va.), *aff'd,* 193 Fed. Appx. 260 (4th Cir. Aug. 8, 2006).  A plaintiff must prove "some significant detrimental effect." *Boone*, 178 F.3d at 256.  An action that "merely causes an employee irritation or inconvenience, but does not affect a term, condition or benefit of her employment" is not an adverse employment action.  *Bullard*, 418 F. Supp. 2d at 810 (quoting *Spriggs v. Public Serv. Comm'n of Md.*, 197 F. Supp. 2d 388, 393 (D. Md. 2002)).

It has long been the law in the Fourth Circuit that a transfer in position, without a demotion or change in title or pay, generally does not implicate actionable conduct. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208 (4th Cir. 2007) (reassignment does not constitute adverse employment action for purposes of discrimination claim); *Boone v. Golden*, 178 F.3d 253 (4th Cir. 1999) ("absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action [for retaliation purposes] even if the new job does cause some modest stress not present in the old position").  *See Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001),  and *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375-76 (4th Cir. 2004).

Subsequent caselaw in this Circuit make it plain that the analysis in *Boone, Von Gunten* and *James* survives *Burlington Northern:* a mere transfer, even an involuntary one, does not generally rise to the level of actionable retaliatory conduct. *See, e.g., Scurlock-Ferguson v. City of Durham*, No. 09-1719, 2010 U.S. App. LEXIS 11556 (4th Cir. June 7, 2010) (affirming district court determination, subsequent to post-*Burlington Northern* remand, that transfer to a different department does not constitute actionable adverse employment action under Title VII); *Parsons v. Wynne*, 221 Fed. Appx. 197, 199 (4th Cir. 2007) (removal from alternative work schedule does not satisfy *Burlington Northern* material adversity requirement); *EEOC v. Cromer Food Services*, 691 F. Supp. 2d 646, 655-56 (D.S.C. 2010) (transfer of complaining employee to shift that starts at 4:00 a.m. not actionable as retaliation); *Sturdivant v. Geren*, No. 1:09cv586, 2009 U.S. Dist. LEXIS 109953 (E.D. Va. Nov. 19, 2009) (transfer to new position without reduction in pay not actionable as retaliation); *Rivera v. Prince William County Sch. Bd.*, No. 1:09cv341, 2009 U.S. Dist. LEXIS 63647 (E.D. Va. July 22, 2009) (transfer of teacher to different school, different grade not actionable as retaliation); *Penn v. Aerospace Corp.*, No. 1:08cv620, 2009 U.S. Dist. LEXIS 17083 (E.D. Va. Mar. 6, 2009) (transfer from Chantilly, Virginia to different job at Washington Navy Yard not actionable as retaliation, in the absence of diminished responsibility or opportunity for promotion); *Shannon v. Commonwealth of Virginia Dept. of Juvenile Justice*, 3:06cv413, 2007 U.S. Dist. LEXIS 25170 (E.D. Va. April 4, 2007) (reassignment to different job duties not actionable as retaliation). *See also Webb v. N.C. Dept. of Crime Control & Pub. Safety*, 658 F. Supp. 2d 700, 709-10 (E.D.N.C. 2009) (placement on paid administrative leave followed by reinstatement with "no loss in pay, benefits or seniority" not actionable as retaliation). *Cf. Sherman v. Westinghouse Savanna River Co.*, 263 Fed. Appx. 357 (4th Cir. Feb. 7, 2008) (transfer can be actionable where new position "subjected [employee]

to appreciably more dangerous conditions – *i.e.*, greater exposure to potentially harmful radiation – than those she faced in her previous post").

Farm 6 was located right across the street from Farm 8 and resulted in no increased commute for Ms. Edwards.  Edwards Dep. 53-54.  In her Amended Complaint (which survived a motion to dismiss), Ms. Edwards alleged that a transfer to Farm 6 would send her "into the hornets nest of frustrated male Mexican workers who had little respect for African-American females."  Am. Compl. ¶ 36.  Yet Ms. Edwards subsequently admitted that she had no idea if any Hispanic males even worked at Farm 6 at that time, and she was not concerned about potential harassment.  Edwards Dep. 57.  Ms. Edwards simply did not want to work alongside another female employee, Ms. Karen Thorpe.  Edwards Dep. 55-57.  Ms. Edwards stated:

> Q:    Okay.  So your problem with going to Farm 6 was that
>       Karen Thorpe was there, not that Hispanic men were there
>       who might harass you, correct?
>
> A:    Yes.

Edwards Dep. 57.  This type of potential personality conflict is, at best, a minor irritation and by no means constitutes a significant detrimental effect.  Ms. Edwards never even made Murphy-Brown aware that she was hesitant to work with Ms. Thorpe.  Edwards Dep. 81.

Independently, Ms. Edwards testified that she was unaware of any retaliatory motive for her transfer (or, for that matter, of any sex-based motive on the part of her co-workers).

> Q:    Is it fair to say that you don't know what motivated
>       Murphy Brown's decision to transfer you to Farm 6?
>
>                    *  *  *  *  *
>
> A:    I don't know.
>
>                    *  *  *  *  *
>
> Q:    Do you have any reason to believe that your Hispanic
>       coworkers' actions towards you on the farm, any of them,
>       were motivated by your sex?

\* \* \* \* \*

A:  I don't know what they had on their mind.

Edwards Dep. 94-96 (multiple objections omitted).  In the absence of such a motive, summary

judgment is appropriate.

## **CONCLUSION**

Murphy-Brown respectfully requests that this Court grant its Motion for Summary

Judgment and dismiss Ms. Edwards' claims in their entirety with prejudice.

September 29, 2011                           Respectfully submitted,

                                                    **MURPHY-BROWN, LLC**

                                                    _____/s/_____
                                                    Of Counsel


                                                    John M. Bredehoft (VSB No. 33602)
                                                    Mark E. Warmbier (VSB No. 77993)
                                                    KAUFMAN & CANOLES, P.C.
                                                    150 West Main Street, Suite 2100
                                                    Norfolk, VA 23510
                                                    Telephone:  (757) 624-3000
                                                    Facsimile:   (757) 624-3169
                                                    jmbredehoft@kaufcan.com
                                                    mewarmbier@kaufcan.com
                                                    _Attorneys for Defendant_

                                                    Frank A. Edgar Jr.  (VSB No. 36833)
                                                    KAUFMAN & CANOLES, P.C.
                                                    11815 Fountain Way, Suite 400
                                                    Newport News, VA 23606
                                                    Telephone: (757) 873-6300
                                                    Facsimile: (757) 873-6359
                                                    faedgarjr@kaufcan.com
                                                    _Attorneys for Defendant_

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September 2011, a true copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Henry L. Marsh, III, Esq.
> Hill, Tucker & Marsh
> 422 East Franklin Street, Suite 301
> Richmond, Virginia  23219
> 804-648-9074
> htm@htm-law.com
> *Attorneys for Plaintiff*
>
> Henry E. Howell, III, Esq.
> The Eminent Domain Litigation Group, P.L.C.
> One East Plume Street
> Norfolk, Virginia 23510
> 757-446-9999
> heh@eminentdomaingroup.us
> *Attorneys for Plaintiff*

> _____ /s/
> John M. Bredehoft (VSB No. 33602)
> Mark E. Warmbier (VSB No. 77993)
> KAUFMAN & CANOLES, P.C.
> 150 West Main Street, Suite 2100
> Norfolk, VA 23510
> Telephone:  (757) 624-3000
> Facsimile:   (757) 624-3169
> jmbredehoft@kaufcan.com
> mewarmbier@kaufcan.com
> *Counsel for Defendant*

11081614_1.DOC